Town of Boylston *vs.* Commissioner of Revenue
& others[1] (and a companion case).

Suffolk. May 8, 2001. - June 26, 2001.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Massachusetts Water Resources Authority. Taxation,* Value, Payment by Commonwealth in lieu of taxes. *Statute,* Construction. *Words,* "Watershed."

In a proceeding before the Appellate Tax Board challenging valuations made by the Commissioner of Revenue under G. L. c. 58, §§ 13-17, of land in Boylston that is part of the Wachusett watershed and reservoir, the board correctly decided that land under the waters of the Wachusett reservoir should not be valued for purposes of determining payments in lieu of taxes due the town of Boylston by the Massachusetts Water Resources Authority under G. L. c. 59, § 5G. [400-406]

In a proceeding before the Appellate Tax Board challenging valuations made by the Commissioner of Revenue under G. L. c. 58, §§ 13-17, of land that is part of the Wachusett watershed and reservoir, the board correctly concluded that the commissioner's valuation methodologies for the nonreservoir land within the watershed satisfied, and complied with, the duty imposed on the commissioner under G. L. c. 58, §§ 13-17. [406-408]

Appeal from a decision of the Appellate Tax Board.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*John R. Maciolek (Gregory J. Angelini* with him) for the plaintiff.

*Diane C. Tillotson* for Massachusetts Water Resources Authority.

*Susan Paulson,* Assistant Attorney General, for Commissioner of Revenue & another, was present but did not argue.

Greaney, J. The town of Boylston (Boylston) appeals from a decision of the Appellate Tax Board (board) upholding valua-

---

[1]The Metropolitan District Commission (MDC) and the Massachusetts Water Resources Authority (MWRA). These entities were before the Appellate Tax Board as interested parties. The Commissioner of Revenue was the appellee.

tions made by the Commissioner of Revenue (commissioner), under G. L. c. 58, §§ 13-17, of land located in Boylston that is part of the Wachusett watershed and reservoir. The land is held by the Metropolitan District Commission (MDC), division of watershed management, for the Massachusetts Water Resources Authority (MWRA). The commissioner made the valuations to determine the payments in lieu of taxes (PILOT) due to Boylston by the MWRA under G. L. c. 59, § 5G.[2] The board concluded that the land under the waters of the Wachusett reservoir should not be valued for purposes of computing PILOT and that the commissioner's valuation methodologies were properly formulated and applied. We transferred the appeal here on our own motion and now affirm the board's decision.

The background of the case may be summarized as follows. As of January 1, 1990, and again as of January 1, 1995, the

---

[2]General Laws c. 59, § 5G, provides, in pertinent part, as follows:

"The Massachusetts Water Resources Authority, on July first of each year, shall pay over to the division of watershed management, an amount to be held in trust for payment to each city or town in which property of the Quabbin watershed, Wachusett watershed, Sudbury watershed and Ware River watershed is held by said division for purposes of a water supply or the protection of its sources, said amount to equal that which such city or town would receive in taxes upon the fair cash valuation of the land, which shall not include buildings or other structures except in the case of land taken for the purposes of protecting the sources of an existing water supply, the valuation for each year being reduced by all abatements thereon . . . provided, however, that notwithstanding any other provision of this section, the valuation of such land, held by and for the division of watershed management, for the purpose of payments in lieu of taxes pursuant to this section, shall be determined by the commissioner of revenue in accordance with the provisions of sections thirteen to seventeen, inclusive, of chapter fifty-eight."

". . .

"The Massachusetts Water Resources Authority on July first of each year, shall pay over to the said division of watershed management, an amount to be held in trust for payments in lieu of taxes to the towns of Belchertown, Hardwick, New Salem, Pelham, Petersham and Ware for watershed lands of the Quabbin Reservation . . . . Said amounts to be held in trust as payments in lieu of taxes shall be made only on lands which are above the high water mark of the total acreage in question that is held by each community . . . ."

commissioner undertook to value Wachusett watershed and reservoir lands held by the MDC within Boylston for purposes of computing PILOT under G. L. c. 59, § 5G, to reimburse Boylston for tax revenues lost as a result of the Commonwealth's ownership of watershed property. Using differing valuation methodologies, the commissioner assigned a value of $100 an acre to the land under the Wachusett reservoir in 1990 (before applying a size-based discount), and approximately $70 an acre for the land under the reservoir in 1995. The commissioner estimated the total value of the Wachusett reservoir and watershed lands held by the MDC within Boylston as $10,940,200 on January 1, 1990, and $10,610,694 as of January 1, 1995.[3]

Boylston appealed from both valuations to the board, and the appeals were consolidated. Boylston maintained that the land beneath the Wachusett reservoir was part of the Wachusett watershed for § 5G purposes, and that the commissioner appropriately had included the submerged land in calculating the § 5G PILOT, but Boylston contended that the commissioner had substantially undervalued that land. The board determined, however, that "the land beneath the Wachusett Reservoir was not part of the Wachusett Watershed and, therefore, was not part of the § 5G PILOT program. Accordingly, the Commissioner should not have included the land beneath the Wachusett Reservoir in his valuations." Despite the commissioner's improper inclusion of values for the submerged land, the board affirmed the commissioner's net valuations because "small discrepancies" with respect to the amount and type of eligible acreage "more than offset, in favor of Boylston, any difference in the total net value of the MDC-held land." This appeal by Boylston from the board's decision followed.

1. Because the commissioner's valuations were made under G. L. c. 58, §§ 13-17, the board, in reviewing the valuations, was "perform[ing] a more traditional appellate function, rather than mak[ing] a de novo determination of value." *Assessors of Sandwich* v. *Commissioner of Revenue*, 393 Mass. 580, 586 (1984). In assessing the board's decision, we, therefore, do not

---

[3]The commissioner valued the submerged land at $142,848 as of January 1, 1990, and at $156,220 as of January 1, 1995.

apply a substantial evidence test, but, instead, examine to see whether the board committed any error of law in concluding that the commissioner acted in accordance with G. L. c. 58, §§ 13-17. *Id.*

The first question is whether the board correctly concluded that the land under the waters of the Wachusett reservoir should be excluded for the purposes of computing PILOT to Boylston under G. L. c. 59, § 5G. Boylston argues that the language and legislative history of § 5G demonstrate that the board erred. The commissioner relies on the same sources, and principles of statutory construction, to argue that the board's conclusion was correct.

The key inquiry is what land is included within the general, undefined term "watershed" used in § 5G. Because § 5G does not provide a definite answer to the question, it is appropriate to consult other sources to obtain a resolution, see *Henry* v. *Board of Appeals of Dunstable*, 418 Mass. 841, 843 (1994); *Oxford* v. *Oxford Water Co.*, 391 Mass. 581, 587-588 (1984), and we now proceed to do so.

(a) The legislative history underlying § 5G, and the statutes creating the Wachusett reservoir, provide pertinent information. That history reaches back more than one hundred years when, recognizing the need to create a water supply for Boston and its surrounding suburbs, the Legislature authorized the creation of the Wachusett reservoir (initially reservoir on the Nashua River). St. 1895, c. 488, §§ 1, 4, 6. A board of health report, referenced in the 1895 statute, described the proposed reservoir as requiring 5,163 acres of land in Boylston and other municipalities, 4,195 of which would be submerged land, and the remainder to serve as a "margin" around the reservoir, including islands. 1895 House Doc. No. 500, at 130 (cited in St. 1895, c. 488, § 3). That same report also described the watershed in these terms: "The boundary of the water-shed was reconnoitered for its whole length, and carefully located upon the State map. Every part of the water-shed has been visited, and all of the swamps, ponds and reservoirs have been located with care." *Id.* at 125-126 and Plan No. 4. The 1895 legislation also directed that annual $2,000 payments be made to Boylston "as part of the expenses of said metropolitan water works," and

specified that the Commonwealth's water board "shall pay no tax or other payment to [Boylston] on account of any property held by said water board for the purposes of a water supply." St. 1895, c. 488, § 16. The following year, the $2,000 payment was increased to $3,000. St. 1896, c. 436, § 1.

By 1897, the Legislature had imposed a dual payment scheme, explicitly distinguishing between payments for land within and without the proposed reservoir. With respect to land within the proposed reservoir, the Legislature amended St. 1895, c. 488, § 16, to provide that, until Nashua River waters were acquired to supply the proposed reservoir, the Commonwealth would make interim annual tax payments based on the assessed value of the property taken to create it; thereafter, the $3,000 annual payments would compensate the town for the reservoir land. St. 1897, c. 467, § 1. Land outside the limits of "said proposed reservoir," however, was treated differently. The statute required the Commonwealth to make annual payments based on an assessed value of the land so long as the Commonwealth owned the land, but the statute went on to specify:

> "[N]o part of the fifty-one hundred and sixty-three acres described in the report of the state board of health on a metropolitan water supply made to the general court in the year eighteen hundred and ninety-five as necessary for said reservoir and the margin around the same shall be included in determining the amount to be paid in consequence of the taking of property outside the limits of said reservoir and margin."

St. 1897, c. 467, § 1. It is thus apparent, from primary legislative sources, that the Legislature intended to, and did, treat the original 5,163 acres described in the board of health report as "reservoir" land differently from watershed lands outside the reservoir's limits.

That distinction has continued. In 1928, the Legislature repealed that portion of St. 1895, c. 488, § 16, which related to lands "outside the limits of the Wachusett reservoir in the town of Boylston [held by the Commonwealth] for the purposes of

the metropolitan water supply." St. 1928, c. 290, § 1.[4] Among other matters, the statute provided, for the first time, that G. L. c. 59, §§ 6 and 7, would "apply to the reimbursement of [Boylston] by the commonwealth on account of said land." *Id.* The Legislature left unchanged the payment scheme for lands within the Wachusett reservoir, which continued to be governed by St. 1895, c. 488, as amended.[5]

In the ensuing fifty-six years, G. L. c. 59, §§ 6 and 7, were renumbered and revised, but none of the changes modified the quantum of land to be valued for the purposes of PILOT in any relevant manner.[6] Indeed, the parties do not dispute that from 1895, until at least the mid-1980's, St. 1895, c. 488, governed

---

[4]That statute was entitled "An Act to change the basis of payments in lieu of taxes on certain property held by the commonwealth outside the limits of the Wachusett reservoir in the town of Boylston for purposes of the metropolitan water supply." Section 2 of St. 1928, c. 290, provided that:

> "The provisions of section sixteen of chapter four hundred and eighty-eight of the acts of eighteen hundred and ninety-five, as amended by section one of chapter four hundred and thirty-six of the acts of eighteen hundred and ninety-six and by section one of chapter four hundred and sixty-seven of the acts of eighteen hundred and ninety-seven, relative to the reimbursement of the town of Boylston for loss of taxes on all real estate taken or acquired by the commonwealth outside the limits of the Wachusett reservoir, so far as the same relate to said town, are hereby repealed."

[5]Boylston acknowledges that, after the 1928 amendment, "[it] was to receive the annual lump-sum payment of $3,000 a year [for the reservoir lands], plus a [PILOT] for all lands located outside the Reservoir."

[6]Statute 1933, c. 254, § 25, changed the payment dates. Statute 1936, c. 59, §§ 1 and 2; St. 1941, c. 440; and St. 1946, c. 410, amended G. L. c. 59, §§ 6 and 7, to make them applicable to airports. Statute 1939, c. 451, § 21, substituted "appellate tax board" for "board of tax appeals." Statute 1945, c. 367, §§ 1 and 2, amended G. L. c. 59, § 7, to make it applicable only to land acquired before January 1, 1946, and inserted G. L. c. 59, § 7A, relating to property acquired after January 1, 1946. Statute 1968, c. 497, amended G. L. c. 59, §§ 6 and 7A, with respect to property valuations, and St. 1978, c. 514, §§ 75 and 76, changed them back and substituted the "commissioner of revenue" for the "state tax commission." Also in 1978, G. L. c. 59, §§ 6-7A, were repealed, and §§ 23-25 of a new G. L. c. 59A, which contained substantially similar language, were substituted. St. 1978, c. 580, §§ 30, 38. Those provisions were repealed in 1979, when §§ 5D, 5E, and 5F were added to c. 59. St. 1979, c. 797, §§ 12, 23. In 1984, the Massachusetts Water Resources Authority Act (MWRA Act) altered the mechanisms previously

payments to Boylston on account of land within the limits of the Wachusett reservoir.

In 1984, the Legislature established the MWRA and authorized it to maintain and operate the water supply system for the greater Boston area. St. 1984, c. 372, § 1. Initially, the MWRA was required by G. L. c. 59, § 5G, inserted by St. 1984, c. 372, § 40A, to make PILOT solely with respect to lands held by the Commonwealth within the Quabbin and Ware River watersheds, and no provision was made in § 5G to provide payments for reservoir land, or to apply § 5G to land within the Wachusett watershed or reservoir.

The omission did not go unnoticed. In 1986, the Legislature directed the Department of Revenue to conduct a study to determine the then-current level of PILOT to Boylston and other communities, as well as what such payments would be if they were based on "current assessed valuation" of such lands, as required by G. L. c. 59, § 5G. St. 1986, c. 696. The department reported that, if payments were based on the current assessed valuation, PILOT would rise by $87,929.

Following submission of the study, the Legislature amended G. L. c. 59, § 5G, to provide for PILOT for land within the Wachusett and Sudbury watersheds. St. 1987, c. 564, § 52. Nothing in the legislative history discloses any legislative intent to change or discontinue the disparate treatment of reservoir and watershed lands; to apply G. L. c. 59, § 5G, for the first time, to land within the boundaries of the Wachusett reservoir; or to expand the scope of the land to be valued for purposes of PILOT. In the absence of some indication of specific legislative intent to change a long-standing practice, we decline to infer one.

(b) Language used in other related statutes further suggests that the Legislature did not intend to treat the term "watershed"

governed by G. L. c. 59, §§ 5D, 5E, and 5F. St. 1984, c. 372, §§ 38, 39, 40.

Finally, we note that St. 1930, c. 416, § 11, a provision not cited by any of the parties, generally substituted the board of tax appeals for the Superior Court for review purposes, but also rewrote G. L. c. 59, § 7, to provide that G. L. c. 59, §§ 6 and 7, would not apply to property held for the purposes of a metropolitan water supply in Boylston. Nothing in that provision changes our analysis.

to include "reservoirs" for purposes of § 5G. Notably, the MWRA Act, St. 1984, c. 372, § 2, defines, for the purposes of the Act, a "[w]atershed system" as including the "Quabbin watershed, Quabbin Reservoir, Ware River watershed, Wachusett watershed, Wachusett Reservoir, North and South Sudbury Watersheds, [and] Sudbury Reservoir." Thus, to interpret the term "watershed," as used in the 1984 version of G. L. c. 59, § 5G, to include "reservoirs" is inconsistent with the Legislature's use of both terms to describe distinct entities elsewhere in the Act.

Similarly, G. L. c. 92, § 104, defines the term "[w]atersheds" as "the natural basin from within which water drains or in natural course would drain into the Quabbin reservoir, the Wachusett reservoir, or the Ware river upstream of the Ware river intake." That statute also defines "[w]atershed system," and includes the Wachusett watershed and the Wachusett reservoir as separate entities. *Id.* These sources indicate that, while both a watershed and a reservoir are part of a "watershed system," a reservoir is distinct from a watershed.

(c) A general principle of statutory construction provides that a term should be given its plain and ordinary meaning, unless a contrary legislative intent is demonstrated. *Henry* v. *Board of Appeals of Dunstable*, 418 Mas. 841, 843 (1994). We usually determine the "plain and ordinary meaning" of a term by its dictionary definition. The term "watershed" is defined in Webster's Third New Int'l Dictionary 2584 (1993), as "a region or area . . . draining ultimately to a particular watercourse or body of water." A second lexical reference, the American Heritage Dictionary of the English Language 1448 (1970), defines "watershed" as "[t]he region draining into a river, river system, or body of water." "Reservoir," by contrast, is defined as "[a] body of water collected and stored in a natural or artificial lake." *Id.* at 1106.

These sources (legislative history, language in related statutes, and dictionary definitions) satisfy us that, for over one hundred years, land above the water and land below the water in a watershed system have been treated differently, and that the term "watershed" in § 5G encompasses only the former, while

the term "reservoir" encompasses the latter.[7] We conclude that the board correctly decided that land under the waters of the Wachusett reservoir should not be valued for purposes of PILOT. This conclusion, an almost intuitive one, comports as well with the established principle that the exemption from local taxation for State owned property granted under G. L. c. 59, § 5, Second, can be overridden only by "express enactment or by clear implication," *Boylston Water Dist.* v. *Tahanto Regional Sch. Dist.*, 353 Mass. 81, 83 (1967), quoting *Worcester County* v. *Mayor & Aldermen of Worcester*, 116 Mass. 193, 194 (1874), a situation that clearly does not exist here.

2. We reject Boylston's arguments challenging the commissioner's valuation methodologies for the nonreservoir land within the watershed.[8] Boylston contends that the valuations were arbitrary and capricious, and violated G. L. c. 59, § 5G, because they did not produce values that reasonably approximated "fair cash value." General Laws c. 58, § 13, which controls the valuation procedure used by the commissioner for PILOT, provides that "the commissioner shall . . . determine as of January first the fair cash value as hereinafter provided of

[7]The last paragraph of G. L. c. 59, § 5G, see note 2, *supra*, provides for PILOT for lands within the Quabbin Reservation, but "only on lands which are above the high water mark of the total acreage in question that is held by [the specified communities]." Boylston argues that the absence of a similar modifying phrase with respect to the statute's description of the Wachusett watershed indicates that the Legislature intended to include the land under the Wachusett reservoir for PILOT purposes. We disagree.

One difference between the Quabbin and Wachusett watersheds is that, prior to G. L. c. 59, § 5G, municipalities within the Quabbin watershed had never received PILOT on account of Commonwealth-owned lands within the borders of communities annexed following the creation of the reservoir. St. 1938, c. 240, § 9, amending St. 1927, c. 321, § 20. The effect of the term "high water mark" in the last paragraph of § 5G is to remedy that express exclusion with respect to lands outside the "high water mark" of the Quabbin reservoir. See *id.* By so doing, the Legislature required the MWRA to make PILOT for the benefit of municipalities containing watershed lands of the Quabbin Reservation that had been included in the municipalities taken to establish the watershed system. The Legislature did not intend to alter the entire scheme of § 5G in the manner suggested by Boylston. If anything, the presence of the modifying phrase tends to confirm the interpretation given by the board to § 5G with respect to the Wachusett watershed.

[8]Based on what has been decided, we do not address Boylston's arguments concerning valuation of the land beneath the Wachusett reservoir.

all [eligible PILOT land] . . . . The determination of value made under this section shall be in such detail as to lots, subdivisions or acreage as the commissioner may deem necessary."

Boylston maintains that the statute does not define the "detail" necessary to arrive at a valuation, and that the commissioner's valuation methodology was insufficient under *Assessors of Sandwich* v. *Commissioner of Revenue,* 393 Mass. 580 (1984). In that decision, this court stated: "[I]n the context of a Statewide valuation program [namely, a valuation under G. L. c. 58, § 13] . . . the board should determine whether the Commissioner has adopted a procedure which (1) can be applied equally to each town where there are eligible State owned lands and (2) will produce values reasonably approximate to fair cash value." *Id.* at 588.

In the *Assessors of Sandwich* case, the commissioner had undertaken a valuation of all State owned lands, pursuant to G. L. c. 59, § 13, and the town appealed from the commissioner's valuation to the board, which modified the commissioner's determination. This court, concluding that the board had overstepped its role under G. L. c. 58, § 13, reversed and stated the following standard:

> "In determining whether the Commissioner complied with the statute, the board's task is not to substitute its own judgment as to the most appropriate method of valuation. Rather, it should determine whether the method used by the Commissioner is reasonably designed to achieve the statute's objectives, and whether that method was properly implemented in the particular case. . . . If. the procedure adopted by the Commissioner is not arbitrary or capricious, it should be upheld."

*Id.*

Boylston's principal assertion is that the commissioner's valuation methodology is fundamentally flawed because it purportedly did not account for various unpaved roads in the determination of lot frontages. After considering Boylston's evidence and arguments, the board concluded that the commissioner's methodolo-

gies for the relevant years met the standards of G. L. c. 58, § 13, and that they had been appropriately applied.[9]

The board was correct. The commissioner was not required to conduct valuations for purposes of G. L. c. 58, § 13, using the same approach a real estate appraiser might use for a single purpose. *Assessors of Sandwich* v. *Commissioner of Revenue, supra* at 587-588. Instead, the commissioner was required only to provide towns "with . . . an approximate reimbursement of lost taxes." *Id.* at 587. The board made extensive findings of fact on the commissioner's applications of his methodologies in arriving at valuations for PILOT purposes. The board considered the testimony of experts offered by Boylston on whether the commissioner had met the statutory objectives of G. L. c. 58, § 13, and it was not convinced by the criticisms voiced by those experts about the commissioner's valuations. The board also acted within its authority in rejecting various plans and testimony offered by Boylston to prove the number of "frontage" or developable lots within the watershed. Having decided that the commissioner's valuations satisfied, and complied with, the duty imposed on him under G. L. c. 58, §§ 13-17, the board acted properly in upholding the valuations.

3. The board's decision is affirmed.

*So ordered.*

---

[9]The board concluded that Boylston "did not adequately show the existence or extent of any other possible streets or ways that might have provided additional road frontage for development, consistent with the [1985 State Owned Land Valuation] Guidelines." Indeed, the Guidelines do not appear to limit valuation consideration to paved roads; they focus, instead, on "front lots on applicable municipal streets, roads or state highways and value the land as developable building lots."