EUGENIA AARON[1] *vs.* BOSTON REDEVELOPMENT AUTHORITY.

No. 05-P-1115.

Suffolk. April 19, 2006. - July 21, 2006.

Present: CYPHER, BERRY, & GREEN, JJ.

*Real Property,* Adverse possession. *Municipal Corporations,* Adverse possession. *Adverse Possession and Prescription. Urban Renewal. Redevelopment Authority. Redevelopment of Land.*

Discussion of the statutory rights of the Commonwealth to recover land under G. L. c. 260, § 31. [807-808]

This court concluded that land held for urban renewal purposes by the Commonwealth or one of its political subdivisions is held for a "public purpose" within the meaning of G. L. c. 260, § 31, and therefore is exempt from any claim of adverse possession, even beyond the twenty-year standard limitation on the Commonwealth's right of recovery. [808-811]

CIVIL ACTION commenced in the Land Court Department on November 19, 2004.

The case was heard by *Leon J. Lombardi,* J., on a motion for summary judgment.

*John E. Heraty* for the plaintiff.

*Saul A. Schapiro* for the defendant.

BERRY, J. The question presented in this appeal is whether the provisions of G. L. c. 260, § 31, in effect, insulate against an adverse possession claim land held by the Boston Redevelopment Authority (BRA) for the purposes of effectuating an urban renewal plan.[2] We hold that, under G. L. c. 260, § 31, land so

---

[1]Upon motion filed with this court, Eugenia Aaron, the successor in interest to the original plaintiff, Mbadiwe Okongwu, has been substituted as a party as of this date.

[2]General Laws c. 260, § 31, as amended by St. 1987, c. 564, § 54, provides as follows:

"No action for the recovery of land shall be commenced by or in behalf of the commonwealth, except within twenty years after its right

held for urban renewal purposes by the Commonwealth, or one of its political subdivisions (here, by and through the BRA),[3] is held for "a public purpose" within the meaning of this statute. Therefore, under G. L. c. 260, § 31, the superior land recovery rights of the Commonwealth preclude the claim of adverse possession made by the plaintiff.

1. *Background.* The following facts were determined by the Land Court to be not in dispute. In early 1963, the BRA proposed the Washington Park Urban Renewal Plan (Washington Park Plan) for the Roxbury neighborhood of Boston. The Washington Park Plan's goal was "to stimulate and to facilitate public, private and institutional development efforts in the area in such a way as (1) to preserve the neighborhood, (2) to assure the public health and safety, (3) to strengthen the physical pattern of neighborhood activities, (4) to reinforce the fabric of family and community life, and (5) to provide a more wholesome framework of environmental conditions better suited to meet the requirements of contemporary living."

Before we turn to G. L. c. 260, § 31, it is helpful to place that section in the larger context of the General Laws, including the major legislative enactment governing urban development in the Commonwealth. General Laws c. 121B sets forth a comprehensive scheme for urban renewal and housing development. General Laws c. 121B, § 48, sets the framework for the process of approval of an urban renewal project, such as

---

or title thereto first accrued, or within twenty years after it or those under whom it claims have been seized or possessed of the premises; . . . provided . . . that this section shall not bar any action by or on behalf of the commonwealth, or any political subdivision thereof, for the recovery of land or interests in land held for conservation, open space, parks, recreation, water protection, wildlife protection or other public purpose."

[3]For ease of reference, the Commonwealth and its political subdivisions will collectively be referred to as "the Commonwealth." It is not disputed in this appeal that the BRA was the developing agency for housing and urban development projects in the city of Boston, and is to be considered as within the class of the Commonwealth's political subdivisions. Therefore, that agency will, as appropriate in context, either be referenced by the initials BRA, or shall be deemed to be included in the general collective reference to the Commonwealth.

the Washington Park Plan, by the Boston city council, the mayor, and the Commonwealth, through its Department of Housing and Community Development (DHCD).

The Washington Park Plan was originally approved in 1963 with a forty-year effective period, to reach an anticipated completion date in February, 2003, which later was extended through April, 2015.[4] Under the terms of the Washington Park Plan, the BRA, by eminent domain, took title to a number of properties in the Roxbury section of Boston. Among the properties taken by the BRA was a parcel of land of approximately 4,950 square feet located at 100 Ruthven Street (locus). The BRA acquired the locus in 1968, and at the time of that taking, the locus was cleared. It remained a vacant lot for nearly forty years.[5] In June, 2003, in connection with housing to be constructed on the locus as a part of the Washington Park Plan, the BRA issued a request for proposals for the sale of the locus to a private developer for construction of a residential building. The proposed residential building to be constructed on the locus is a two-family home, with parking spaces and improved open space. A developer was designated by the BRA in February, 2004.

The residential building and appurtenances proposed by the BRA would span a strip of land that lies within the locus. The disputed strip of land, over which the plaintiff claims title by adverse possession, is situated in the middle of the locus and is separated from the rest of the locus by a chain-link fence. The plaintiff's property, located at 197-203 Humboldt Avenue, abuts the rear of the locus. The plaintiff claims that the disputed strip

---

[4]In December, 2002, the BRA approved a two-year extension of the Washington Park Plan, through February 18, 2005, which extension was approved by the DHCD. In December, 2004, the BRA voted to extend the term of the Washington Park Plan through April, 2015. The submission of this additional BRA extension to DHCD for further approval would have occurred after the compilation of the summary judgment record; that later procedural event does not affect the legal issue presented in this appeal.

[5]The delay in developing the land, even for nearly forty years, does not alter the legal analysis set forth herein. "It is not unreasonable for [a government entity] to refrain from developing property unless and until there is a need to do so. To require town boards in control of land to do otherwise would encourage unnecessary or premature development and preclude careful planning for future needs." *Harris* v. *Wayland*, 392 Mass. 237, 242 (1984).

of land has, for more than twenty years — adverse to the BRA's holding — been openly and notoriously used as a driveway to access the rear of the plaintiff's property for parking and deliveries. The plaintiff points to his[6] own acts of adverse possession and seeks to tack adverse possession usage by predecessors in title.

The plaintiff commenced this action in the Land Court in November, 2004, seeking a declaration that his adverse use established a prescriptive easement over the subject strip of land. The BRA moved for summary judgment on the basis that the plaintiff could never validly hold any clear record right, title, or interest in this strip of land by adverse possession or prescriptive easement because the BRA at all times, as provided in G. L. c. 260, § 31, maintained a right to recover the strip of land. The Land Court granted the BRA's motion for summary judgment. We affirm.

2. *The statutory rights of the Commonwealth to recover land.* In order to comprehend the effect of G. L. c. 260, § 31, on a claim of adverse possession such as advanced here, the positive grant to the Commonwealth of the right to recover land under G. L. c. 260, § 31, must also be considered — almost in mirror view — in terms of its negative effect upon third parties who would assert countervailing claims of right, title, or interest adverse to the Commonwealth. The positive, and the negative, effects of the Commonwealth's rights under § 31 to recover land appear in two clauses, yielding different time frames, which may be described as follows. Viewed in the positive, the first clause of § 31 states that the Commonwealth may institute litigation to recover land within twenty years after the occurrence of the adverse acts which necessitate the Commonwealth commencing an action to recover the land subject to the adverse claims.[7] If the Commonwealth does *not* act within twenty years, the Commonwealth loses its rights to recover the subject land. This means that, under the first clause of § 31, the negative effect upon third-party claimants is limited to twenty years. Thus, under the first clause of § 31, a third party could assert a claim of adverse possession against the Commonwealth,

---

[6]We refer here to the original plaintiff and therefore use the male pronoun.
[7]See note 2, *supra.*

if the Commonwealth did not commence an action to recover the land within twenty years after such adverse possession began.

The second clause in G. L. c. 260, § 31, however, carves out an exception to the twenty-year limitation on the Commonwealth's recovery rights for land held for "conservation, open space, parks, recreation, water protection, wildlife protection or *other public purpose*" (emphasis added). Accordingly, if the Commonwealth is holding land for the purposes outlined, the negative effect on third-party claimants is that they will not be able to sustain a claim against the Commonwealth's superior right to the land even after twenty years. It is this second clause of § 31 and more particularly the last three words, for "other public purpose," which is at issue in this appeal.

More precisely stated, the issue in this case is whether the holding of land by the BRA for urban renewal purposes, including, but not limited to, housing development, under the Washington Park Plan, constitutes an "other public purpose" within the meaning of G. L. c. 260, § 31.[8] If so, the plaintiff's claim of adverse possession is negatived by the second clause in § 31, because the plaintiff's claim cannot stand against the superior right of the Commonwealth under § 31 to recover the land, which extends the Commonwealth's right of recovery beyond the twenty-year limitations period governing adverse possession. In ultimate effect, if the BRA's holding of the locus falls within the second clause of § 31, then the plaintiff's adverse possession claim in the disputed strip of land would be extinguished.

3. *Urban renewal as a public purpose within the § 31 exception.* In determining whether an urban renewal project such as the Washington Park Plan is for a public purpose, we begin with a consideration of G. L. c. 121B, the urban renewal statute, pursuant to which the Washington Park Plan was formulated and approved by the city of Boston. In enacting c. 121B, the Legislature determined that urban renewal

---

[8]As there are no disputed material facts, and as this case presents a pure issue of statutory construction, it was an appropriate candidate for summary judgment. See *Annese Elec. Servs., Inc.* v. *Newton*, 431 Mass. 763, 764 n.2 (2000) ("statutory interpretation is a question of law for the court to decide").

programs, including housing development, are necessary for the public interest. G. L. c. 121B, § 45. The importance to the public in the redevelopment of blighted areas and in housing construction is similarly recognized in judicial precedent. "Taking for redevelopment an area which is a 'blighted open area' as defined by G. L. c. 121B, § 1, is a public purpose." *Benevolent & Protective Order of Elks, Lodge No. 65* v. *Planning Bd. of Lawrence*, 403 Mass. 531, 539-540 (1988). "[H]ousing authorities and other public housing bodies are public instrumentalities carrying out public purposes . . . ." *Cameron* v. *Zoning Agent of Bellingham*, 357 Mass. 757, 761 (1970).[9]

Notwithstanding the legislative determination and judicial precedent holding urban renewal and development under G. L. c. 121B is for a "public purpose," the plaintiff argues that the term "public purpose," as appearing in G. L. c. 260, § 31, is more narrowly circumscribed and does not include the purposes of urban renewal. As support for this narrowed reading of the term "other public purpose" in § 31, the plaintiff urges that we apply the doctrine of ejusdem generis to § 31 — a doctrine outlined as follows: "Where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Banushi* v. *Dorfman*, 438 Mass. 242, 244 (2002), quoting from 2A N.J. Singer, Sutherland Statutory Construction § 47.17, at 273-274 (6th ed. rev. 2000).

The plaintiff quotes the list of purposes enumerated in the second part of § 31, extending beyond twenty years the Commonwealth's recovery rights, namely, "conservation, open space, parks, recreation, water protection, and wildlife protection . . . ." Based on the foregoing list, the plaintiff argues that the last phrase, "or for other public purpose" must be of the

[9]The Washington Park Plan envisioned that land acquired by the BRA in this urban renewal project would be sold to private developers for construction under the Plan. The law is clear that the sale to a private developer in an urban renewal project does not negate a plan's public purpose. "Disposition to a private redeveloper of property acquired pursuant to a valid plan may be necessary to achieve the public purpose." *Benevolent & Protective Order of Elks, Lodge No. 65, supra* at 551. See *Kelo* v. *New London*, 125 S. Ct. 2655, 2663-2664 (2005).

same ilk as the enumerated list and should not encompass urban renewal. The argument is unpersuasive. "That canon of construction [ejusdem generis] is not to be applied mechanistically whenever [and simply because] a string of terms is separated by commas . . . . Rather, it is designed to narrow broad language when the literal meaning of that language does 'not fairly come within [a statute's] spirit and intent.' " *Perlera v. Vining Disposal Serv., Inc.,* 47 Mass. App. Ct. 491, 496 (1999), quoting from *Kenney v. Building Commr. of Melrose,* 315 Mass. 291, 295 (1943).

For the foregoing reasons we determine that urban renewal, concerned, as it is, with the improvement of the environment and surroundings in which the people of the Commonwealth live, is within the meaning of the words "other public purpose" as found in G. L. c. 260, § 31, and is fully consonant with the other public purposes outlined therein.[10] The improvement of what is now a vacant lot by construction of a modern two-family home with parking and outdoor space will not only enhance the neighborhood, it will further the important public purpose of increasing the supply of housing in the Commonwealth.

The housing shortage has a long history in the Commonwealth. Indeed, as far back as 1966, the Legislature declared that the "shortage [of housing] is inimical to the safety, health, morals and welfare of the residents of the commonwealth and the sound growth of the communities therein." St. 1966, c. 708, § 2. More recently, a study by Northeastern University's

[10]We note that, in addition to providing housing stock, urban renewal projects, including the Washington Park Plan, often include proposals to use acquired land for the specifically enumerated public purposes of G. L. c. 260, § 31, e.g., parks, recreational areas, and open spaces. In this instance, the Washington Park Plan listed the following objective: "to provide sites for new and improved schools, play areas and other open spaces and essential community facilities." See G. L. c. 121B, § 45, as inserted by St. 1969, c. 751, § 1 (declaring as a public use and benefit urban renewal's provision of "streets, parks, recreational areas and other open spaces").

The plaintiff conceded at oral argument that if the BRA had intended to use the locus as a park, the adverse possession claims would fail under § 31. It would lead to absurd results if the BRA, holding land for use in an urban renewal project, could be subject to losing its rights depending solely on the particular subproject within an urban renewal plan for which that land was to be dedicated.

Center for Urban and Regional Policy attributed the Commonwealth's declining population and lackluster job growth to the high cost of living and, specifically, the lack of affordable housing.[11] It cannot be gainsaid that the continued development of the area served by the Washington Park Plan through the construction of modern homes promotes the public purpose — including but not limited to the particular definition of public purpose in G. L. c. 260, § 31 — by benefiting the immediate community the Plan was intended to serve, and by advancing the welfare of the Commonwealth as a whole.

*Judgment affirmed.*

---

[11]Bluestone, Executive Summary, Sustaining the Mass Economy: Housing Costs, Population Dynamics, and Employment, May 22, 2006, available for download at http://www.curp.neu.edu/publications/reports.htm#sustaineconomy (last visited July 7, 2006).