# United States Court of Appeals
## For the First Circuit

Nos.  02-1510
      02-1557
      02-1651

UNITED STATES,

Plaintiff, Appellee,

v.

ONE-SIXTH SHARE OF JAMES J. BULGER IN
ALL PRESENT AND FUTURE PROCEEDS OF
MASS MILLIONS LOTTERY TICKET NO. M246233,
REGISTERED IN THE NAME OF MICHAEL LINSKEY,

Defendant.

OLGA DAVIS; MARION HUSSEY; JOHN P. BULGER,

Claimants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lynch, Circuit Judge.

Robert S. Sinsheimer, with whom Sinsheimer & Associates was on the brief, for appellant Olga Davis.

Ann M. Donovan, with whom Law Office of Ann M. Donovan was on the brief, for appellant Marion Hussey.

George F. Gormley, with whom Christie M. Charles and George F. Gormley, P.C. were on brief, for appellant John P. Bulger.

Richard L. Hoffman, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on the brief, for appellee.

————————————

April 14, 2003

————————————

**LYNCH**, **Circuit Judge**.    Three individuals moved to intervene in a long-closed civil forfeiture action.  They sought to assert claims to a one-sixth share of a $14.3 million winning state lottery ticket, still in payout, which had belonged to James "Whitey" Bulger.  Two of the claimants, Olga Davis and Marion Hussey, are mothers of young women whom Whitey Bulger allegedly murdered in the 1980s; the other is one of his brothers, John Bulger.

In 1995, Whitey Bulger was indicted for crimes related to his alleged leadership of the Winter Hill Gang in Boston.  He went into hiding and is on the FBI's list of the "ten most wanted" fugitives.  Later that year, the government brought an in rem civil forfeiture action against Bulger's share of the prize, based upon the theory that he had purchased the ticket as a money-laundering device.  The district court entered a default judgment forfeiting the property in January 1996.

In 2001, the government, to its credit, filed a submission with the district court based on new information about the lottery ticket which cast doubt on its money-laundering theory. In its submission, the government argued that the forfeiture remained valid and should not be disturbed.  Later that year, the three claimants, none of whom was previously involved in the forfeiture proceedings, moved to intervene and to reopen the case.

Davis and Hussey also brought wrongful death actions in state court against Whitey Bulger in 2001.

The district court found that the motions were filed on the basis of newly-discovered evidence, and therefore were barred by the one-year limit for moving to vacate a judgment on this basis. See Fed. R. Civ. P. 60(b). We do not reach the Rule 60 issue. Instead, we hold that none of the claimants has either standing to intervene or a viable claim, and so affirm.

I.

The lottery ticket was a "season ticket," which enters the owner's selected numbers into every drawing for a year. In July 1991, the ticket won a $14.3 million jackpot, payable in twenty annual installments. The registered owner, Michael Linskey, claimed the prize. He also submitted to the Massachusetts State Lottery Commission a written agreement between himself and three partners whom he said had contributed to the $100 price of the ticket and co-owned it. According to the agreement, Michael Linskey owned half of the ticket. The other half was evenly divided between his brother, Patrick Linskey; Kevin Weeks; and Whitey Bulger. All three of these men were allegedly affiliated with the Winter Hill Gang, whose criminal activities are described in greater detail in United States v. Flemmi, 225 F.3d 78 (1st Cir. 2000), and United States v. Salemme, 91 F. Supp. 2d 141 (D. Mass. 1999).

From 1991 through 1994, annual winnings and the attendant tax liability were duly apportioned to the four co-owners of the ticket. The Lottery Commission paid the winnings to Michael Linskey, who arranged for the South Boston Savings Bank to disburse the funds among the four owners. Under this arrangement, Whitey Bulger's share, $119,408 a year before taxes, was deposited in a joint account he held at that bank with John Bulger. The total amount of the payments due to Whitey Bulger from 1995 through the final payment in 2010 was nearly two million dollars before taxes.

In January 1995, Whitey Bulger was indicted for racketeering and other offenses related to his alleged organized crime activities. He disappeared and has not been apprehended. On July 17, 1995, the federal government brought a verified in rem complaint for civil forfeiture of Whitey Bulger's share of the ticket under 18 U.S.C. § 981(a)(1)(A) (1994) (amended 2000). A supporting affidavit provided information from two confidential informants who said that Whitey Bulger paid Michael Linskey $700,000 in cash for his share of the ticket after it won the jackpot, thus laundering illegal criminal proceeds by replacing the tainted funds with apparently legitimate payments from the Lottery Commission. A magistrate judge found that this complaint established probable cause and issued a warrant and monition authorizing the seizure from the Lottery Commission of "such one-sixth share of the gross amount otherwise due and payable to

-5-

Michael Linskey." Both the complaint and the warrant defined the defendant res as "the one-sixth share of James J. Bulger in all present and future proceeds of Mass Millions Lottery Ticket No. M246233, registered in the name of Michael Linskey." The seizure was widely reported in the media and was front-page news in both of Boston's major newspapers.

Whitey Bulger never appeared to contest the lottery forfeiture. Later evidence established his awareness of the forfeiture action. His sister, Jean Holland, filed a claim to the one-sixth share on behalf of herself and his other heirs. She also asked the state probate court to appoint her as his receiver, but the request was rejected. Since she was not his receiver, the federal court dismissed Holland's claim for lack of standing. This court affirmed the dismissal for lack of standing in an unpublished opinion. United States v. One-Sixth Share, 101 F.3d 106 (table), 1996 WL 662459 (1st Cir. 1996) (per curiam). Holland pursued her state litigation to be appointed as Whitey Bulger's receiver for several more years; it was finally dismissed with prejudice by the Supreme Judicial Court in October 2000. John Bulger was not a party in either of these state or federal cases.

Two weeks after dismissing Holland's claim, and in the absence of any other claimants in the six months since the case was filed, the district court entered a default judgment ordering the one-sixth share forfeited to the government on January 26, 1996.

-6-

The order defined the res, or "Defendant Property," in exactly the same language as the complaint and the warrant. It stated that "all other persons and entities claiming any right, title or interest in or to the Defendant Property . . . are held in default." It also stated, "This shall be, and is, the full and final disposition of this civil forfeiture action with regard to the Defendant Property."

The United States sought forfeiture of Whitey Bulger's other assets as well. It secured an in rem default judgment against his Florida condominium. The government also seized the funds in the account at the South Boston Savings Bank held jointly in the names of both John and Whitey Bulger; John Bulger filed a timely claim in that litigation. This court ultimately found that, because John Bulger had possession of the funds and exercised sufficient dominion and control over the joint account, he had standing to contest this forfeiture. United States v. $81,000, 189 F.3d 28, 39 (1st Cir. 1999). John Bulger later reached a settlement dividing the money in the account equally between himself and the government.

The lottery ticket forfeiture case remained closed for over five years. During that time, ticket co-owner Weeks was indicted, pled guilty, and entered into a cooperation agreement with the government. In his debriefings, Weeks stated that he and Whitey Bulger had never paid anything for their shares of the

winning ticket. Rather, Weeks said, they had spread the story that they were laundering money in order to assuage the temper of another criminal associate, Stephen Flemmi, who was angry at being excluded from the lottery winnings. This new information undermined the government's money-laundering theory, which it had used to demonstrate probable cause for seizure and to justify forfeiture. In February 2001, the government filed a submission with the district court which reported this new evidence, but also argued that Weeks's revelation was not a basis for disturbing the default judgment. Among other reasons, it made arguments (which we do not resolve) that there were alternative bases for civil and criminal forfeiture of the one-sixth share.

Weeks also implicated Whitey Bulger in a number of murders, including those of Davis's daughter in 1982 and Hussey's daughter in 1985. Weeks provided information that led the authorities to their bodies. A superseding indictment unveiled in September 2000 charged Whitey Bulger with these homicides. Davis and Hussey filed wrongful death actions against Whitey Bulger in state court in February 2001. Whitey Bulger has now been implicated in a total of nineteen murders.

Within a few months of the government's 2001 submission concerning the Weeks debriefings, Davis, Hussey, and John Bulger

each moved in district court to set aside the default judgment forfeiting the lottery proceeds payable to Whitey Bulger.[1]

The day before oral argument on these motions in the district court, Davis and Hussey went before the state judge presiding over their wrongful death actions and secured what is styled an equitable lien, subject to some limitations, on the one-sixth share.  The United States was not a party in the state proceeding and did not appear, although the state court took judicial notice of the federal civil forfeiture.  The state court found Davis and Hussey "are entitled to as strong an equitable lien on said proceeds as this Court, pursuant to its general equitable powers, may grant."  It ordered the Lottery Commission to hold future payments to Whitey Bulger in escrow "to the extent permissible with the civil forfeiture currently in place."  It made the same order, nunc pro tunc, with respect to prior payments going back to 1995, "to the extent possible with the civil forfeiture currently in place."

The federal district court denied the claimants' motions.  United States v. One-Sixth Share, No. 95-11513, 2002 WL 550405 (D. Mass. March 28, 2002).  While the court noted the potential lack of

---

[1]    The three motions were based on slightly different procedural mechanisms.  Davis moved to intervene under Fed. R. Civ. P. 24.  Hussey styled her motion as a request for an extension of the deadline to file a claim and a motion to set aside the default judgment under Rule 60(b).  John Bulger moved both to intervene and to set aside the judgment.  For purposes of the standing analysis, these differences are not relevant.

standing, it did not consider that issue and rested its judgment on the untimeliness of the motions. Id. at *3-*4.[2] The claimants appealed.

## II.

Standing is a threshold consideration in all cases, including civil forfeiture cases. See United States v. Cambio Exacto, S.A., 166 F.3d 522, 526 (2d Cir. 1999); see also McInnis-Misenor v. Me. Med. Ctr., 319 F.3d 63, 67 (1st Cir. 2003). Because civil forfeiture is an in rem proceeding, the property subject to forfeiture is the defendant. Thus, defenses against the forfeiture can be brought only by third parties, who must intervene. Generally, an intervenor must have independent standing if the intervenor would be the only party litigating a case. See Arizonans for Official English v. Arizona, 520 U.S. 43, 64-65 (1997); Mangual v. Rotger-Sabat, 317 F.3d 45, 61 & n.5 (1st Cir. 2003).

---

[2] Motions for relief from judgment must be made within a "reasonable time," which is limited to one year in certain circumstances, including newly-discovered evidence. See Fed. R. Civ. P. 60(b). The district court held that the motions were based on newly-discovered evidence, the Weeks information, and that no "exceptional circumstances" justified an extension of the resulting one-year deadline. One-Sixth Share, 2002 WL 550405, at *4-*5. Normally we would reverse these determinations only if the court had abused its wide discretion to so decide. See Farm Credit Bank v. Ferrera-Goitia, 316 F.3d 62, 65 (1st Cir. 2003). Because we base our ruling on standing alone, we do not review them.

Standing in such cases has both constitutional and statutory aspects. See Cambio Exacto, 166 F.3d at 526; United States v. One 1985 Cadillac Seville, 866 F.2d 1142, 1148 (9th Cir. 1989); 1 D.B. Smith, Prosecution and Defense of Forfeiture Cases ¶ 9.04(2)(a), at 9-68 (2002). But cf. United States v. $557,933.89, 287 F.3d 66, 79 & n.9 (2d Cir. 2002) (questioning whether claimant needs to demonstrate Article III standing since plaintiff typically bears burden to show standing and government is plaintiff).

The federal forfeiture statute defines rules as to who may intervene and when they must do it. By virtue of the roots of in rem jurisdiction in admiralty law, the procedures for intervention in civil forfeitures are governed by the Supplemental Rules for Certain Admiralty and Maritime Claims. See 18 U.S.C. § 981(b)(2) (1994) (amended 2000); United States v. One Dairy Farm, 918 F.2d 310, 311 (1st Cir. 1990). Supplemental Rule C(6), as it read in 1995, required a party to submit a "claim" to the property within ten days.[3] "A party who fails to file a claim normally

---

[3]    A substantial overhaul of federal civil asset forfeiture laws was enacted in 2000. See Civil Asset Forfeiture Reform Act of 2000 (CAFRA), Pub. L. 106-185, 114 Stat. 202. These changes took effect long after the events at issue in this case. See id. § 21, 114 Stat. at 225 (effective date). Among its changes, CAFRA extended the time limit for claimants to file, leading to amendment of the Supplemental Rules. Another change is one of nomenclature: the "claim" is now called a "statement of interest or right." We apply both the rules and the terminology that were in force at the time of the forfeiture.

-11-

lacks standing to contest a forfeiture." One Dairy Farm, 918 F.2d at 311; see, e.g., United States v. 3,888 Lbs. of Atlantic Sea Scallops, 857 F.2d 46, 49 (1st Cir. 1988) (failure to file timely claim disqualifies would-be intervenor); see also United States v. One Urban Lot, 885 F.2d 994, 998-1000 (1st Cir. 1989) (allowing standing without claim where verified answer was timely filed and there was no prejudice to government from delay, but dismissing where claimant filed neither claim nor answer).

As to constitutional standing, "It is well established that a party seeking to challenge a forfeiture of property must first demonstrate an ownership or possessory interest in the seized property in order to have standing to contest the forfeiture." United States v. 116 Emerson St., 942 F.2d 74, 78 (1st Cir. 1991) (quotation omitted). Courts should not, however, conflate the constitutional standing inquiry with the merits determination that comes later. See United States v. 5 S 351 Tuthill Rd., 233 F.3d 1017, 1023-24 (7th Cir. 2000) (criticizing tests of straw ownership that deny standing rather than denying claims on their merits).

At the initial stage of intervention, the requirements for a claimant to demonstrate constitutional standing are very forgiving. In general, any colorable claim on the defendant property suffices. $81,000, 189 F.3d at 35 ("Courts generally do not deny standing to a claimant who is either the colorable owner of the res or who has any colorable possessory interest in it.");

-12-

see United States v. 7725 Unity Ave. N., 294 F.3d 954, 957 (8th Cir. 2002) ("The claimant need only show a colorable interest in the property, redressable, at least in part, by a return of the property."); 5 S 351 Tuthill Rd., 233 F.3d at 1023 (claimant must show only "actual stake in the outcome" of forfeiture); Cambio Exacto, 166 F.3d at 527 ("[W]hile ownership and possession generally may provide evidence of standing, it is injury to the party seeking standing that remains the ultimate focus."); United States v. One 18th Century Colombian Monstrance, 797 F.2d 1370, 1375 (5th Cir. 1986) (claimant "must be able to show at least a facially colorable interest in the proceedings sufficient to satisfy the case-or-controversy requirement and prudential considerations") (internal quotation omitted); see also United States v. 221 Dana Ave., 261 F.3d 65, 71 & n.5 (1st Cir. 2001) (noting congressional intent that ownership be broadly defined to include anyone with legal or equitable interest in property).

Although these tests are forgiving, the United States argues that all three claimants lack both types of standing.

A. John Bulger

John Bulger's failure to file a timely claim as required by Supplemental Rule C(6) -- or indeed any claim at all until years after the judgment -- is sufficient on its own to disqualify him from intervention now. There is no reason to forgive that failure. He filed a timely claim in the forfeiture action against the joint

-13-

bank account, litigated that case vigorously, and ultimately reached a settlement with the government. It is beyond serious dispute that he was aware of the parallel forfeiture action against the lottery proceeds. See $81,000, 189 F.3d at 32 (describing how John Bulger learned of the lottery forfeiture complaint and withdrew cash from the joint account, "motivated by a concern that further forfeiture proceedings might be in the offing"). Yet he did not submit a similar claim in the lottery case, or even participate in his sister's efforts to intervene. His knowing failure to file anything at that time, whether because he chose not to do so or because he recognized his lack of standing, leaves him with no good excuse for his tardiness. See One Urban Lot, 885 F.2d at 999 (dismissing where neither claim nor answer was filed).

John Bulger actually concedes that he lacked constitutional standing to bring the case in 1995, in order to explain why he could not appeal from the original default judgment and to thereby distinguish his case from United States v. One Rural Lot, 238 F.3d 76 (1st Cir. 2001) (per curiam).[4] He suggests that the intervening event that cured this admitted lack of standing was the Weeks evidence. This effort fails. Nothing about the Weeks

_____

[4]    In that case, claimants' failure to appeal the original judgment was held to bar relief under Rule 60(b)(4), because it was their own choice not to appeal. Id. at 79; see also Cotto v. United States, 993 F.2d 274, 277-78 (1st Cir. 1994) (finding that a failure to appeal barred Rule 60 relief). Here, John Bulger chose to make no attempt whatsoever to intervene in the case at the appropriate time.

-14-

evidence changed John Bulger's relationship to the forfeited property or the injury he suffered as a result of forfeiture. The new information may have affected the arguments he could make, but not his standing to make them.

He advances a final argument, saying that since he had standing to contest the forfeiture of the joint bank account, see $81,000, 189 F.3d at 39, he must have standing here. Not so. In this case, as in that one, he relies on his connection to the joint bank account as the basis for his claim of interest. He argues here that, because the annual payments were deposited into the joint account, they would have come under his control shortly after their disbursement. He also argues that, but for the forfeiture of the lottery proceeds, the joint account would have contained an additional $480,020.16 in lottery payments at the time of his May 2000 settlement with the government in the $81,000 litigation, presumably resulting in a larger share for him.

In $81,000, this court meticulously reviewed facts pointing in different directions to conclude that, on balance, John Bulger had standing to contest the forfeiture of money that was already in the joint bank account, despite numerous indications that it actually belonged to Whitey Bulger, because John Bulger had possession of that money and dominion and control over it. See id. at 36-39. In contrast, here John Bulger never possessed any of the lottery payments after 1994. He had no influence whatsoever over

-15-

the payments, at least until they were deposited into the account. By seizing the funds before they made their way into the joint account, the government removed any possession or control John Bulger had over them, thus tipping the $81,000 analysis against him. See 18 U.S.C. § 981(f) (2000) (giving United States "[a]ll right, title, and interest" in forfeited property).

B. Davis and Hussey

Davis and Hussey are in a more sympathetic position. Unlike John Bulger, at the time of the default judgment, they did not know that they might possess any relevant right or interest in the lottery forfeiture case. The whole theory of their current attempt to intervene is that this court should forgive their failure to establish statutory standing at that time and should turn back the clock to allow them to file claims now. It is true that this court has used its equitable powers to read the requirements for filing claims somewhat broadly in the interests of justice. See 116 Emerson St., 942 F.2d at 77-78 ("Whether a belated claim will be recognized often depends on the existence of mitigating factors."); One Urban Lot, 885 F.2d at 999-1001 (applying admiralty law's traditional liberal construction of procedural practices to in rem civil forfeiture case). For the reasons that follow, the doctrine does not help Davis and Hussey, because even were we to ignore the failure to file, they do not have the requisite interest in the property to assert a claim.

-16-

Davis and Hussey rely on the purported lien they secured from state court. Normally, a lien against the defendant property would establish standing. See 18 U.S.C. § 981(a)(2) (1994) (amended 2000) (barring forfeiture of property "to the extent of the interest of an owner or lienholder" who was uninvolved in the criminal activity); In re Metmor Fin., Inc., 819 F.2d 446, 448 & n.2 (4th Cir. 1987) ("There is no question" that holder of mortgage is entitled to innocent owner status to extent of interest); Town of Sanford v. United States, 961 F. Supp. 16, 16-17, (D. Me. 1997), aff'd 140 F.3d 20, 22 (1st Cir. 1998) (lien for back taxes on forfeited property entitles town to innocent owner defense). Given the generous standards for constitutional standing, it is arguable that they had a colorable claim once the state court acted.

There are two problems with their purported lien, however. First, at the time the state court acted in 2001, "[a]ll right, title, and interest" in the property had already vested in the United States over five years earlier. 18 U.S.C. § 981(f). There was no share of the lottery proceeds left in Whitey Bulger's name. The Lottery Commission informed the district court in July 2001 that it believed the forfeiture order applied to one-sixth of the entire prize, and that the state court order was inconsistent with the federal forfeiture. State court jurisdiction over Whitey Bulger would have been inadequate to confer authority for disposing of property that he no longer owned, and the state court did not

-17-

have or purport to exercise jurisdiction over the United States. Cf. Fierro v. Reno, 217 F.3d 1, 6-7 (1st Cir. 2000) (refusing to recognize state court's nunc pro tunc order modifying twenty-year-old child custody order for purposes of defining immigration status of deportee).

Second, the state court was aware of the issue and included broad language in its order to exclude any interest that the federal government already had in the property by virtue of the civil forfeiture. The equitable lien is only enforceable "to the extent permissible with the civil forfeiture currently in place." This exception swallows up whatever hold the lien would otherwise provide over the res. Davis and Hussey can hardly displace a first-in-time final judgment by virtue of an equitable lien which explicitly excludes property subject to that judgment.

Without the lien to provide standing connected to the res itself, Davis and Hussey must fall back on their more general claims against Whitey Bulger. They have a significant problem here as well, because they have never demonstrated that they possess any judgment against him. They rely on the fact that his default has been entered by the clerk of the state court under Mass. R. Civ. P. 55(a). As the government points out, however, under Massachusetts rules this is not the same as a judgment, which must be pursued in cases of default according to additional procedures under Mass. R. Civ. P. 55(b). See Mass. R. Civ. P. 55, reporters' notes (1973)

("Rule 55 embraces two separate and distinct procedures . . . ."). It appears that Davis and Hussey remain mere plaintiffs, rather than judgment creditors. But the problem is more serious than one of timing -- if they held a judgment, it would not solve the problem.

Even were we to assume that they held a judgment against Whitey Bulger, it would be only a general in personam judgment, not a secured interest against any particular asset that he owned. In most circumstances, such general creditors are outside the ambit of the "owner or lienholder" to which the statute then referred. 18 U.S.C. § 981(a)(2) (1994) (amended 2000). "[T]he federal courts have consistently held that unsecured creditors do not have standing to challenge the civil forfeiture of their debtors' property." United States v. $20,193.39, 16 F.3d 344, 346 (9th Cir. 1994) (collecting cases); see Smith, supra, ¶ 9.04, at 70.6-70.7 ("A mere equitable interest in the property was historically not deemed sufficient to confer standing.").

Whether this rule about general creditors may ever be relaxed in unusual circumstances is an issue we need not decide. In the related context of criminal forfeiture, some circuits have said "never." For example, a line of cases holds:

> [A] general creditor can never have an interest in specific forfeited property, no matter what the relative size of his claim vis-a-vis the value of the defendant's post-forfeiture estate. Were it otherwise, the court litigating the forfeiture issue would be converted into a bankruptcy court and would not be able to grant

-19-

> forfeiture to the government until it determined that no general creditor would be unable to satisfy its claim against the defendant.

United States v. BCCI Holdings (Lux.), S.A., 46 F.3d 1185, 1191-92 (D.C. Cir. 1995); accord United States v. Watkins, 320 F.3d 1279, 1283 (11th Cir. 2003); United States v. Ribadeneira, 105 F.3d 833, 836-37 (2d Cir. 1997); United States v. Campos, 859 F.2d 1233, 1237-38 (6th Cir. 1988). Other courts say "hardly ever." See United States v. Reckmeyer, 836 F.2d 200, 206-08 (4th Cir. 1987) (general creditors may have claim where criminal forfeiture reaches all discovered and undiscovered assets of debtor). Here, the competing general creditors are more than a mere abstraction: in light of the other murder allegations, there are at least seventeen other families of victims with potential wrongful death claims against Whitey Bulger.

Davis and Hussey offer two rebuttals to these arguments against their standing. They first argue, without authoritative support, that future lottery payments could not be part of the res subject to forfeiture, because "there is no right to seize cash which does not yet exist" and in rem jurisdiction is limited to "the seizure of a physical object." As a result, they say, payments other than the one made in 1995 were never seized, and are therefore subject to their lien.

This argument is meritless. The complaint, the warrant, and the order all define the res as the "one-sixth share of James

-20-

J. Bulger in all present and future proceeds" (emphasis added) from the winning ticket. That res was forfeited in its entirety to the United States at the time of the judgment in January 1996. There is no meaningful difference between this case and the forfeiture of a share of stock, which includes the right to receive future dividends. See, e.g., United States v. 2,538.85 Shares of Stock, 988 F.2d 1281, 1283-84 (1st Cir. 1993) (discussing procedures for seizing intangible property in civil forfeiture cases). The contention that a res must be tangible is belied by long-running debate concerning jurisdiction over an intangible res. See generally 4A C.A. Wright & A.R. Miller, Federal Practice and Procedure § 1071 (3d ed. 2002).

Davis and Hussey also argue that forfeiture of the right to lottery payments is impermissible under Massachusetts law making them unassignable, or at least that the question is open to doubt so they should be permitted to litigate it. In federal civil forfeiture proceedings, the definition of ownership interests is governed by state law. See $81,000, 189 F.3d at 33. However, the state law that Davis and Hussey cite hurts them instead of helping them. It provides, "No right of any person to a prize shall be assignable except that . . . any person pursuant to an appropriate judicial order may be paid the prize to which the winner is entitled . . . ." Mass. Gen. Laws ch. 10 § 28 (2002). An "appropriate judicial order" issued by a federal court has

forfeited a one-sixth share of the prize to the United States, consistent with state law.

The anguish of a parent whose child has been murdered is unending. Taking the property of the murderer is incomplete recompense, at best, but may provide some sense of justice. Congress has provided for justice a different way: it has provided that the government, which stands for all the citizens, may take the criminal's property by forfeiture, and it has limited those who may assert competing claims. Courts must adjudicate the laws which Congress enacts. If Davis and Hussey wish to pursue the matter, they should turn to the executive branch, to which the property was properly forfeit. See 18 U.S.C. § 981(d) ("The Attorney General shall have sole responsibility for disposing of petitions for remission or mitigation with respect to property involved in a judicial forfeiture proceeding.").

### III.

The district court's judgment is **affirmed**. No costs are awarded.