# United States Court of Appeals
## For the First Circuit

No. 20-2061

UNITED STATES OF AMERICA,

Plaintiff, Appellee,

v.

LETTER FROM ALEXANDER HAMILTON TO THE MARQUIS DE LAFAYETTE DATED
JULY 21, 1780,

Defendant in Rem,

ALDRICH L. BOSS, as personal representative for the estate of
STEWART R. CRANE,

Claimant, Appellant,

COMMONWEALTH OF MASSACHUSETTS, Acting by and through The
Massachusetts Archives,

Claimant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Judith G. Dein, U.S. Magistrate Judge]

Before

Howard, Chief Judge,
Selya and Lynch, Circuit Judges.

Ernest Edward Badway, with whom Fox Rothschild LLP was on
brief, for appellant.
Carol E. Head, Assistant United States Attorney, with whom
Nathaniel R. Mendell, Acting United States Attorney, was on brief,

for appellee United States.

Adam J. Hornstine, Assistant Attorney General, with whom Maura Healey, Attorney General of Massachusetts, was on brief, for appellee Commonwealth of Massachusetts.

October 6, 2021

**SELYA**, <u>Circuit Judge</u>.  Alexander Hamilton was a principal author of the Federalist Papers and our nation's first Secretary of the Treasury.  Few people played more significant roles in the founding of the republic.  When he wrote a letter to the Marquis de Lafayette on July 21, 1780 (the Letter), warning of imminent danger to French troops in Rhode Island, Hamilton scarcely could have imagined that it would some day become the focal point of a civil forfeiture action.  But truth often outpaces imaginings, and — after the Letter was seized by the Federal Bureau of Investigations (FBI) from a fine antiques auctions house in Virginia — the United States (the government) filed just such a forfeiture action the United States District Court for the District of Massachusetts.  The district court, tasked with resolving competing claims advanced by the Commonwealth of Massachusetts (the Commonwealth) and Aldrich L. Boss in his capacity as personal representative for the estate of Stewart R. Crane (the Estate), awarded the Letter to the Commonwealth.  The Estate appeals.  Concluding, as we do, that the Estate's reach exceeds its grasp, we affirm.

## I. BACKGROUND

This civil forfeiture action begins — and ends — with the provenance of the property that lies at its center.  That provenance is (unless otherwise indicated) uncontroverted.

Upon learning that British troops stationed in New York

- 3 -

were "making an embarkation with which they menace the French fleet and army" stationed in Rhode Island, Hamilton wrote the Letter to relay that information to Lafayette. When Lafayette received the Letter, he met with Massachusetts General William Heath, who forwarded the Letter, accompanied by a letter of his own summarizing Lafayette's intelligence, to the President of the Massachusetts Council (the Commonwealth's executive body during the Revolutionary War period). The Council received these missives on July 26, 1780, and, as a result, authorized sending Massachusetts troops to Rhode Island to bolster the embattled French forces.

The Letter, along with the Council's other records of the period, were transferred in due course to the Commonwealth and eventually entered the custody of the Massachusetts Archives (the Archives). An internal table of contents and name index for Volume 202 of the Archives collection identified the Letter and General Heath's cover letter as part of the collection when the index was compiled in the mid-nineteenth century. Some thirty years later (in the 1880s), the Archives again identified the Letter in an index of Volume 202. And in the 1920s, the Archives selected Volume 202 for reproduction using the then-novel technology known as photostatic copying. A photostat of the Letter was made and bound in a separate booklet along with other documents from Volume 202.

At some point thereafter, the Letter left the Archives. The date of the Letter's departure is shrouded in mystery. It is evident, however, that by the time a compilation of Hamilton's papers was being prepared in the 1950s, the Letter had disappeared. Only the photostat could be found in the Archives. See The Papers of Alexander Hamilton, Volume II: 1779-1781 362-63 (Harold C. Syrett ed., 1961).

How the Letter vanished from the Archives collection is hotly disputed. Although we do not resolve that contretemps, we recount the parties' conflicting positions.

The government and the Commonwealth assert that the Letter was purloined by Harold E. Perry, a kleptomaniacal cataloguer who worked for the Archives from 1938 to 1945 or 1946. Perry had extensive access to original papers and, during his tenure, absconded with numerous historical documents. He sold some to disreputable dealers and hoarded others in his Cambridge residence. By the time the compilation of Hamilton's papers was published in 1961, the Archives had declared that the Letter was "missing." See id. The Estate conjures up an alternate reality. It suggests that the Letter was "permissively alienated from the Archives" by "negligence" or because the Archives no longer wanted to go through the trouble of maintaining the original document.

Whatever its itinerary, the Letter eventually came into

the possession of Stewart R. Crane.[1]  Stewart Crane inherited the letter from his grandfather, R.E. Crane.   In November of 2018, Stewart Crane included the letter in a consignment to the Potomack Company (Potomack), a Virginia auctioneer, for sale at auction. Potomack discovered that the letter was listed as "missing" from the Archives, contacted the Archives, and learned that the Archives deemed the Letter stolen.  Potomack notified the FBI, which seized the letter pursuant to a judicial warrant on December 19, 2018.

Roughly five months later, the government filed a verified complaint for forfeiture in rem against the Letter, alleging that the Letter was subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) as property traceable to a violation of 18 U.S.C. § 2314 and/or 18 U.S.C. § 2315 (statutes that criminalize, respectively, interstate transport of and trade in stolen goods valued over $5,000).   See 18 U.S.C. §§ 1956(c)(7)(A), 1961(1). The complaint also alleged that "only the Commonwealth can lawfully own original documents from its collection dated before 1870, including . . . the [Letter]" because Massachusetts law "prohibits the lawful removal or alienation of such documents from the

---

[1] According to the Estate's reconstruction of events — a reconstruction not burdened with many hard facts — the Letter was purchased in good faith and for value in 1945 by R.E. Crane from John Heise Autographs, a reputable rare documents dealer in Syracuse, New York.  In support, the Estate proffered only an affidavit recounting this family history and an empty envelope, postmarked in 1945, addressed to R.E. Crane and bearing the return address of the dealer.

Commonwealth's custody." As required by Rule G(4)(a) and (b) of the Supplemental Rules of Admiralty or Maritime Claims and Asset Forfeiture Actions, notice was given to all known potential claimants and posted on a government website.

The government gave due notice of the institution of the forfeiture proceedings. Only the Commonwealth and the Estate filed claims to the Letter.[2] The government moved to strike the Estate's claim under Supplemental Rule G(8)(c)(i)(B), asserting that the Estate lacked standing to intervene as a claimant because the Letter is "a Massachusetts public record that only the Commonwealth can own" and because "one cannot maintain good title to stolen property against its true owner." The Estate counter-attacked, moving to dismiss the government's complaint for failure to state a claim upon which relief could be granted. See Fed. R. Civ. P. 12(b)(6).

All parties consented to proceed before a magistrate judge, see 28 U.S.C. § 636(c); Fed. R. Civ. P. 73(a), who consolidated the pending motions for hearing. After receiving the parties' briefs and hearing arguments, the district court, in a thoughtful rescript, granted the government's motion to strike the Estate's claim. See United States v. Letter from Alexander

_____

[2] Stewart Crane died on December 21, 2018 (two days after the Letter was seized by the FBI). His Estate stepped into his shoes and filed the claim sub judice.

Hamilton to the Marquis de Lafayette Dated July 21, 1780, 498 F. Supp. 3d 158, 175 (D. Mass. 2020). The court concluded (as relevant here) that the Letter was a public record, which could be owned only by the Commonwealth, thus precluding any ownership interest by the Estate. See id. at 165-71. The court then denied as moot the Estate's motion to dismiss. See id. at 175. And having concluded that the Commonwealth is the only entity that can own the Letter, the court awarded it to the Commonwealth. This timely appeal followed.

## II. ANALYSIS

With eyes on the prize, the Estate assails the judgment below on multiple fronts. First, the Estate argues that the Letter is not a public record that only the Commonwealth may own. Second, the Estate argues that even if the Letter is a public record, the Letter could have been — and was — lawfully alienated by the Commonwealth. Third, the Estate argues that because its predecessor in interest purchased the Letter for value and without knowledge of its possible theft, it is an "innocent owner" within the purview of 18 U.S.C. § 983(d) and is thus entitled, at a minimum, to cash compensation. Finally, the Estate argues that the Commonwealth's competing claim (and, by implication, the forfeiture complaint itself) is barred by the doctrine of laches. It is against the backdrop of this asseverational array that we turn to the task at hand.

In a civil forfeiture proceeding, we review a district court's legal conclusions (including legal conclusions on questions of standing) de novo and factual findings for clear error. See United States v. Carpenter, 941 F.3d 1, 6 (1st Cir. 2019); United States v. U.S. Currency, $81,000.00, 189 F.3d 28, 33 (1st Cir. 1999). Where, as here, an interpretation of state law forms part of the district court's reasoning, we review that interpretation de novo. See Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 49 (1st Cir. 2009). We are not wed to the district court's reasoning but, rather, may affirm its final judgment on any rationale made manifest by the record. See Román-Cancel v. United States, 613 F.3d 37, 41 (1st Cir. 2010).

### A. Standing.

Standing is a threshold question in civil forfeiture cases. See United States v. One-Sixth Share of James J. Bulger in All Present & Future Proceeds of Mass Millions Lottery Ticket No. M246233, 326 F.3d 36, 40 (1st Cir. 2003). Parties seeking to press claims of entitlement in such proceedings must demonstrate independent standing. See id. First, such parties must satisfy statutory standing through compliance with the procedures and deadlines for filing a claim set out in Supplemental Rule G. See id. Second, they must demonstrate constitutional standing through a legal ownership or possessory interest that would support an

injury in fact.[3]  See id. at 40-41; see also United States v.
Cambio Exacto, S.A., 166 F.3d 522, 527-29 (2d Cir. 1999).  At the
initial intervention stage, "any colorable claim on the defendant
property suffices."  See One-Sixth Share, 326 F.3d at 41.  As a
result, "[c]ourts do not generally deny standing to a claimant who
is either the colorable owner of the res or who has any colorable
possessory interest in it."  $81,000.00, 189 F.3d at 35.

In civil forfeiture proceedings, those ownership or
possessory interests are defined by state law but their effect is
determined by federal law.  See id. at 33.  A claimant need not
conclusively prove facts supporting his entitlement to the res;
"an allegation of ownership and some evidence of ownership are
together sufficient."  Id. at 35.  But the interest claimed must
be legally possible under state law — supportable by some set of
facts — and that is the crux of the present matter.

As a general rule, courts should be chary about
conflating the threshold standing inquiry with the subsequent
merits inquiry.  See One-Sixth Share, 326 F.3d at 41.  But this
general rule — like virtually every general rule — is subject to

---

[3] This requirement for intervening claimants in the civil
forfeiture context is analogous to the rule that intervenors as of
right under Federal Rule of Civil Procedure 24(a)(2), seeking
different relief from other litigants, must have independent
standing.  See Town of Chester v. Laroe Ests., Inc., 137 S. Ct.
1645, 1651 (2017).  When there are multiple claimants, a claimant
will rarely be seeking relief that does not in some way exclude
other claimants' claims.

- 10 -

exceptions.  Here, the merits and the Estate's standing to contest the merits converge on the same dispositive question of state law: can the Letter only be owned by the Commonwealth?  If the Commonwealth has exclusive ownership and could not have lawfully alienated its interest in the Letter, then the Estate lacks any cognizable legal interest that would give it standing to intervene as a claimant and the Letter must be awarded to the Commonwealth. Given this convergence and given, too, that the merits of the Estate's claim are susceptible to resolution on this basis, we chart a practical course and resolve both together.

**B.  <u>The Merits</u>.**

This case turns on whether the Letter is an historic public record and who can own such historic public records.  The district court held — and the parties agree — that these are questions of Massachusetts law.  See <u>Letter from Alexander Hamilton</u>, 498 F. Supp. 3d at 165 & 165 n.4; <u>cf.</u> <u>Borden</u> v. <u>Paul Revere Life Ins. Co.</u>, 935 F.2d 370, 375 (1st Cir. 1991) (explaining that when "the parties have agreed about what [state] law governs, a federal court . . . is free, if it chooses, to forgo independent analysis and accept the parties' agreement").

Both the meaning of "public records" and the question of who may possess public records have been addressed by statute in Massachusetts since at least 1897.  At that time, Massachusetts revamped its public records laws, instituting the regime that, in

large part, still obtains today.[4]  See An Act Relative to Public Records (1897 Act), 1897 Mass. Acts 411.  It is with that statutory text that we begin.  See U.S. Bank Tr. v. Johnson, 134 N.E.3d 594, 597 (Mass. App. Ct. 2019).

The 1897 Act defined a "public record" in relevant part as "any written or printed book or paper . . . which any officer or employee of the Commonwealth . . . is required by law to receive, or in pursuance of any such requirement has received for filing, and any book, paper, record, or copy mentioned in any of the following five sections."  1897 Mass. Acts 411, ch. 439, § 1. One of those five sections — section 4 — encompasses "[e]very original paper belonging to the files of the Commonwealth . . . bearing a date earlier than the year eighteen hundred" and provides that such records "shall be safely kept."[5] Id. at 412-13, § 4.  For ease in exposition, we refer (as did the district court) to public records satisfying this definition — that is, original papers belonging to the files of the Commonwealth

_____

[4] Because the letter was unquestionably in the custody of the Commonwealth at a point in time subsequent to 1897, we need not retreat any further into the mists of history.  We note, though, that evidence of previous laws requiring the safekeeping of public records fills the margins of early twentieth-century codifications, see, e.g., 1902 Mass. Rev. Laws ch. 35, and a recognition that certain records of a public nature must be kept is enshrined in the Commonwealth's 1780 constitution, see Mass. Const. pt. 2, ch. II, § IV, art. II.

[5] Just four years later, the Massachusetts legislature would strengthen this injunction, requiring that such records "shall be preserved and safely kept."  See 1902 Mass. Rev. Laws ch. 35, § 14.

and dated before the year 1800 — as "historic public records."[6]

Given the explicit language of the 1897 Act, there is no reasonable basis to question that the Letter qualifies as an historic public record.  It is an "original paper" and it "bear[s] a date earlier than the year eighteen hundred."  It was transmitted to the President of the Massachusetts Council as an attachment to a letter by Massachusetts General William Heath (which is still in the possession of the Archives), and it dealt with a matter of public concern.  Furthermore, the Letter's unchallenged provenance makes it pellucid that it was part of "the files of the Commonwealth," was retained by the Commonwealth in the normal course of record-keeping, and was stored in the Archives.  To cinch the matter, the Letter remained there until at least the 1920s, as evidenced (without contradiction) by two different nineteenth-century indices, the 1920s index, and the existing photostatic copy.

Modern Massachusetts public records law does not suggest a different conclusion.  The term "public records" is defined even more expansively under the most recent statute and extends to, among other things, "all books, papers, maps, photographs . . . or other documentary materials or data, regardless of physical form

---

[6] In the current version of the statute, the definition of historic public records has been expanded to include all such papers dated before 1870.  See Mass. Gen. Laws ch. 66, § 8.

- 13 -

or characteristics, made or received by any officer or employee of any agency, executive office, department, board, commission, bureau, division or authority of the commonwealth." Mass. Gen. Laws ch. 4, § 7, cl. 26. While the statute provides some enumerated exceptions, see id. § 7, cl. 26 (a)-(v), all of those exceptions are inapplicable.

The present statute, in consequence of changes in 1901 and 1962, is even stronger and more expansive than the 1897 Act, requiring that "[e]very original paper belonging to the files of the commonwealth . . . bearing date earlier than the year eighteen hundred and seventy . . . shall be preserved and safely kept." Mass. Gen. Laws ch. 66, § 8.

At oral argument, the Estate acknowledged that the Letter appears to be an historic public record under Massachusetts public records law. It lamented, though, that appearances can be deceiving: taking the text of Massachusetts law at face value "would mean nearly everything in the hands of the Commonwealth or a subsidiary agency would have to be construed as a public record." The Estate branded this result as unacceptable. But in support of its jeremiad, the Estate cites only Freeman v. Town of Hudson, 714 F.3d 29 (1st Cir. 2013). That decision, which discussed the scope of extrinsic evidence of "matters of public record" that a federal court may consider on a motion to dismiss, see id. at 36, did not address Massachusetts public records law at all. Consequently, it

offers cold comfort for the Estate's argument.

More pertinent, we think, are the Massachusetts cases that repeatedly have affirmed that the term "public records" must be "broadly defined." Att'y Gen. v. Dist. Att'y for Plymouth Dist., 141 N.E.3d 429, 432 (Mass. 2020); see Hull Mun. Lighting Plant v. Mass. Mun. Wholesale Elec. Co., 609 N.E.2d 460, 463-64 (Mass. 1993) (collecting cases).

Those cases have stressed that, notwithstanding the breadth of the definition, "not every record or document kept or made by a governmental agency is a 'public record'" because "the Legislature has identified twenty categories of records that fall outside of the definition of 'public records.'" Dist. Att'y for Plymouth Dist., 141 N.E.3d at 433 (alterations omitted). The Estate does not argue that the Letter comes within any of those categories.

That ends this aspect of the matter. We conclude, without serious question, that the Letter is an historic public record.

This conclusion is outcome-determinative. Both the government and the Commonwealth have consistently maintained that because the Letter is an historic public record, the Commonwealth is entitled to custody of it. Building on this foundation, they also maintain that the Commonwealth — once the Letter was in its custody — was obliged to ensure that it was "safely kept," thus

- 15 -

precluding its lawful alienation.

The Estate demurs, contending that even if the Letter is an historic public record, the Commonwealth was not obliged to hold fast to the original. In the Estate's view, the Commonwealth could lawfully have alienated the Letter based on statutory provisions allowing destruction of certain categories of documents. See, e.g., Mass. Gen. Laws ch. 66, §§ 8-9. We do not agree.

Massachusetts law leads inexorably to the conclusion that the Commonwealth retains ownership of the Letter as an historic public record and could not have alienated it. To begin, unless otherwise provided — and no such provision is applicable here — the Secretary of State has presumptive custody of all public records of the Commonwealth. See Mass. Gen. Laws ch. 66, § 7; 1897 Mass. Acts at 412, ch. 439, § 3. What is more, the law leaves no room to doubt that the Secretary of State (or some other specifically designated custodian) is the only person who may possess public records on a permanent basis; any person holding public records must return those records to the relevant government custodian on pain of penalties, some criminal, for noncompliance. See Mass. Gen. Laws ch. 66, § 13 ("Whoever is entitled to the custody of public records shall demand the same from any person unlawfully having possession of them, who shall forthwith deliver the same to him."); id. § 15 ("Whoever unlawfully keeps in his

possession any public record or removes it from the room where it is usually kept . . . shall be punished [as provided].").

Iterations of these provisions were in force during the period that the Letter was located in the Commonwealth Archives. See, e.g., 1902 Mass. Rev. Laws ch. 35, § 20 ("Whoever is entitled by law to the custody of public records shall demand the same from any person in whose possession they may be, and he shall forthwith deliver the same to him."); id. § 22 ("Whoever unlawfully keeps in his possession any public record . . . shall . . . be punished [as provided]."). And the Massachusetts legislature continued to strengthen its prerogatives over the custody of public records in succeeding years. See 1951 Mass. Acts 158, 158-59, ch. 200 ("Upon complaint of any public officer entitled to the custody of a public record, the superior court shall have jurisdiction in equity to compel any person having such record in his possession to deliver the same to the complainant.").

Attempting to sidestep the obvious conclusion that these provisions control ownership of the Letter, the Estate speculates that there is a possibility that the Commonwealth could lawfully have alienated the Letter. That is whistling past the graveyard: Massachusetts law requires that original historic public records (like the Letter) "be preserved and safely kept." Mass. Gen. Laws ch. 66, § 8. Although the law provides for the potential destruction of "other paper[s]," such papers do not include

- 17 -

historic public records. Id. This obligation has existed in terms applicable to the Letter dating back to a time well before the Letter left the Archives. See 1897 Mass. Acts at 412-13, ch. 439, § 14.

The "plain and ordinary meaning" of this statutory language is generally the best guide to the legislature's intent. See Town of Boylston v. Comm'r of Revenue, 749 N.E.2d 684, 689 (Mass. 2001). So it is here. With respect to historic public records, "kept" — the operative verb that has appeared throughout the succession of pertinent statutory provisions — is best understood as incorporating facets of its standard definition, which is to "preserve," "maintain," or "retain and to continue to have in one's possession or power esp[ecially] by conscious or purposive policy." Webster's Third New International Dictionary of the English Language Unabridged 1235 (1981). The associated adverb, "safely," denotes the care with which this task should be undertaken by the relevant Commonwealth official. "Preserve," added to the statute shortly after "kept," see 1902 Mass. Rev. Laws ch. 35, § 14, avoids surplusage by reinforcing the notion that "original paper[s] belonging to the files of the Commonwealth" themselves, not copies, must be retained. See Webster's Third, supra at 1794 (defining verb "preserve" as "to keep alive, intact, in existence, or from decay").

Seeking to water down this plain meaning, the Estate

cites Gutierrez de Martinez v. Lamagno, 515 U.S. 417 (1995), for the proposition that "shall" (as in "shall be safely kept") sometimes can mean "may." See id. at 432-34 & 432 n.9. But that usage is quite rare: "the mandatory 'shall,' . . . normally creates an obligation impervious to judicial discretion." Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 35 (1998); see Union of Concerned Scientists v. Wheeler, 954 F.3d 11, 17 (1st Cir. 2020). The Estate has made no effort to show why the normal meaning of shall should not control in this instance. Taking into account the strong policy interest in maintaining historic public records for posterity, we believe that the ordinary meaning of "shall" is what the Massachusetts legislature intended in crafting section 8 and its precursors. Every indication is that the legislature said what it meant and meant what it said.

The bottom line is that Massachusetts law establishes a mandatory duty to preserve and safely keep historic public records in the Commonwealth's possession. The text of the statute brooks no exceptions. It follows that any alienation of historic public records would be unlawful.

Laboring to force a square peg into a round hole, the Estate suggests that two statutory provisions imply the possibility that historic public records could be lawfully destroyed and, thus, alienated. Passing the obvious point that the Letter was never destroyed and still exists, neither of these

- 19 -

statutes possesses the reach that the Estate ascribes to them.

The Estate first alludes to the second independent clause in section 8 of chapter 66, which permits the destruction of "other paper[s]" under certain circumstances. Mass. Gen. Laws ch. 66, § 8. In this statutory context, though, the term "other paper[s]" can be defined only by exclusion of the categories of documents required to be "preserved and safely kept" in the preceding independent clause of the section, which encompasses historic public records. See id. The semicolon separating these independent clauses in the modern statute, see id., fortifies that reading by "shatter[ing] the unity" of the sentence. Globe Newspaper Co. v. Bos. Ret. Bd., 446 N.E.2d 1051, 1056 (Mass. 1983).

The Estate next alludes to section 9 of chapter 66, which permits the copying and replacement of public record books that are no longer "practicable" to maintain as originals. Mass. Gen. Laws ch. 66, § 9. For two reasons, this provision is irrelevant to the case at hand. For one thing, it deals exclusively with a separate category of documents — "public record books" — and historic public records are entirely a different matter. For another thing, there is simply no basis for an assumption that the Letter is (or was) in such a state that preservation was not "practicable." Given these facts, the statutory provisions to which the Estate alludes cast no doubt on the conclusion that historic public records cannot lawfully be alienated.

Our construction of the Massachusetts statutory scheme governing historic public records is consonant with the general principle that "[p]ublic records are the people's records, and the officials in whose custody they happen to be are merely trustees for the people." 66 Am. Jur. 2d Records and Recording Laws § 4 (Aug. 2021). So, too, our construction is consonant with the principle that title to government property may generally pass only in the manner prescribed by legislative enactment and not through the carelessness, negligence, or perfidy of government employees or agents. See, e.g., United States v. California, 332 U.S. 19, 40 (1947) (stating that "[t]he Government, which holds its interests here as elsewhere in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property . . ."); cf. Aaron v. Bos. Redev. Auth., 850 N.E.2d 1105, 1108-09 (Mass. App. Ct. 2006) (observing that adverse possession does not run against the Commonwealth for land held in trust for the public for specified purposes). We think that these principles apply with special force where, as here, the property at issue is an historic public record that constitutes part of the patrimony of the Commonwealth.[7]

---

[7] To be sure, there may be circumstances in which a public entity, acting lawfully, may dispose of property such that it may be deemed abandoned to a fortuitous finder. See, e.g., Morissette v. United States, 187 F.2d 427, 441 (6th Cir. 1951) (McAllister,

Finally, we give short shrift to the Estate's suggestion that the Commonwealth's claim of ownership is barred by the doctrine of laches. In general terms, the doctrine of laches restricts the assertion of claims or defenses by litigants who have slept upon their rights or prerogatives and, thus, have prejudiced opposing parties by or through their inexcusable delay. See City of Sherrill v. Oneida Indian, 544 U.S. 197, 217 (2005). This defense, however, is typically not available against a state or federal sovereign seeking either to enforce a public right or to protect a public interest. See, e.g., Texaco P.R., Inc. v. Dep't of Consumer Affs., 60 F.3d 867, 878 (1st Cir. 1995); Wang v. Bd. of Registration in Med., 537 N.E.2d 1216, 1220 (Mass. 1989); see also United States v. California, 332 U.S. at 40 (explaining that "officers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act"). Such a bar to the use of laches against a sovereign is particularly apt in the context of historic public records held in trust for future generations, and we hold that the

J., dissenting) ("There is no reason why the government may not abandon property as well as an individual."), rev'd, 342 U.S. 246 (1952); Willcox v. Stroup, 467 F.3d 409, 414 n.1 (4th Cir. 2006) (suggesting abandonment as a defense to a state's claim of title). Here, however, the relevant provisions of Massachusetts law foreclose this possibility with respect to historic public records.

- 22 -

bar applies here.[8]

The short of it is that Massachusetts's public records law definitively resolves both the issue of the Estate's standing and the merits of this civil forfeiture action. As an original paper belonging to the Commonwealth and dated in 1780, the Letter is owned by the Commonwealth. It could not lawfully have been alienated to a third party under any statutory regime that was operative either before or after the Letter left the custody of the Commonwealth. This showing — that the Letter could not lawfully have been alienated — is sufficient to satisfy the government's burden "to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1). And because it could not have obtained any lawful interest in the Letter, the Estate lacks any legally cognizable ownership interest that would confer standing upon it to contest forfeiture. The Letter belongs to the Commonwealth and was properly consigned by the district court to its custody.

The lack of a legal ownership interest within the meaning of 18 U.S.C. § 983(d)(6) likewise defeats the Estate's claim that

---

[8] Even if a laches defense was available to the Estate in this case — and it is not — that theory would run aground on the facts. For aught that appears, any delay in bringing a claim was clearly attributable to the fact that the Commonwealth lacked knowledge of the Letter's whereabouts, and both the government and the Commonwealth acted expeditiously once Potomack notified the FBI that the Letter had surfaced.

it is an "innocent owner" under that statutory provision.  Other claims advanced by the Estate are either patently meritless or fatally underdeveloped, and they do not warrant discussion.

**III. CONCLUSION**

We need go no further.  We hold that the Letter is an historic public record as that term is defined in the 1897 Act, as from time to time amended; that, based on the undisputed evidence, the Letter was in the custody of the Commonwealth for some period following the passage of the 1897 Act; and that it could not lawfully have been alienated.  We hold, therefore, that the district court acted appropriately in granting the government's motion to strike the Estate's claim of ownership, in denying the Estate's Rule 12(b)(6) motion as moot, and in honoring the Commonwealth's claim of entitlement to the Letter.  For the reasons elucidated above, the judgment of the district court is

**Affirmed**.